1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                         FOR THE EASTERN DISTRICT OF CALIFORNIA

10    ALEJANDRO SANTANA,

11                    Petitioner,                No. 2:10-cv-2317 FCD KJN P

12          vs.

13    WARDEN OF PBSP,

14                    Respondent.            FINDINGS AND RECOMMENDATIONS

15    _____/

16    I.  Introduction

17                  Petitioner is a state prisoner proceeding without counsel with an application for a

18    writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2008 conviction on

19    charges of malice aforethought murder with special circumstances; specifically, the murder was

20    committed during robbery and carjacking with true findings that petitioner personally used a

21    firearm in each offense.  Petitioner was sentenced to life in prison without the possibility of

22    parole for first degree murder, plus ten years consecutive for firearm use, with stayed terms of

23    five years for robbery, nine years for carjacking, and ten years each for firearm use findings

24    attached to those offenses.  Petitioner raises two claims:  petitioner alleges that the trial court

25    erred in allowing the introduction of (a) allegedly untrustworthy statements by Rivera to Morgan;

26    and (b) testimony concerning a statement made by petitioner prior to receiving warnings pursuant

1

to <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), under an exception for "booking questions" that allegedly should not have applied.  After careful review of the record, this court recommends that the petition be denied.

II.  <u>Procedural History</u>

Petitioner filed a timely appeal to the California Court of Appeal, Third Appellate District.  The judgment was affirmed by the Court of Appeal on June 10, 2010.  (Lodged Document ("LD") 4.)  Petitioner filed a petition for review in the California Supreme Court.  (LD 5.)  The California Supreme Court denied review on September 1, 2010.  (LD 6.)  Petitioner filed the instant petition on August 30, 2010.  (Dkt. No. 1.)

III.  <u>Facts</u>[1]

The opinion of the California Court of Appeal contains a factual summary of petitioner's offenses.

> [Petitioner] purchased a maroon Camaro Z28 with a defective transmission a couple of months before the murder.  He told several of his coworkers at the post office that he was going to steal a car for its transmission, that he had a gun, that a new transmission would cost $6,000, that he could not afford a new transmission, and that he would need help removing a transmission from another car and putting it into his.
>
> [Petitioner] and his friend Jose Rivera did not go to work on August 22, 2000.  That morning, [petitioner's] father saw [petitioner] with someone who looked like Rivera having breakfast at the restaurant where [petitioner's] father worked.
>
> Three skinny young men -- Anthony Camacho, Jose Rivera, and Theodore Santos -- accompanied [petitioner], who was much chunkier than his friends, to a car dealership later that day.  Camacho and [petitioner] went on a test drive in a green or teal Camaro with the victim while Rivera and Santos followed in Rivera's black Camaro.  [Petitioner], who was sitting in the backseat, shot the salesman in the back of the head.  With Camacho's help, he dumped the body on the side of the freeway.

////

---

[1]  The facts are taken from the opinion of the California Court of Appeal for the Third Appellate District in <u>People v. Santana</u>, No. C060202 (June 10, 2010).  (LD 4.)

Witnesses observed three Hispanic males wiping off a greenish-blue Camaro in a parking lot on Q Street. One of the males was chubby, probably weighing between 200 and 220 pounds. The witnesses saw the stocky male get into the black Camaro with his skinny friend and drive away. They went to a park, where [petitioner] tossed a shirt into the river. The shirt was recovered and admitted as evidence at trial.

The four went to Rivera's apartment. A witness saw a short, thin young male and a heavyset male take a white plastic bag to the dumpster. Police found a pair of blue jeans with a 40-inch waist, a white shirt, and socks in the plastic bag. [Petitioner] admitted the jeans might have been his. DNA testing determined that material found on the jeans was a genetic match for [petitioner] and for the victim.

Rivera called one of his coworkers, Daniel Soto, and asked to exchange cars, purportedly to drive his mother to the hospital. A second coworker, Nathan Brones, accompanied Soto to the exchange and testified that Rivera's companion was wearing purple sweatpants and worn hiking boots. Soto was "75 percent sure" Rivera's companion was [petitioner].

Camacho, Rivera, and Santos were apprehended and tried for murder. [Petitioner] fled to Mexico, where he lived under a false identity for five years. Camacho and Rivera were convicted of murder (People v. Rivera (Sept. 28, 2004, C042375) [nonpub. opn.]; People v. Camacho (Apr. 10, 2003, C042933) [app. dism. by order] ); Santos was convicted of being an accessory after the fact (People v. Rivera (Mar. 28, 2003, C042375) [Santos app. dism. by order]).

Santos was a reluctant witness at trial, claiming that the hypnosis he underwent in 2004 helped him to forget the details about the murder. The prosecution, however, played a tape for the jury of an interview he had with a detective on August 24, 2000. During this interview, Santos related the entire chronology of events described above and identified [petitioner] as the "Alex" who needed the transmission and planned to scare the car salesman out of the car but shot him instead, and who then discarded his shirt and maybe his gun in the river.

Alex Gonzales, another friend of [petitioner] from high school, testified that [petitioner] was a bully, overbearing and bigger than all of them. Before the murder, he had purchased a Cobra at the same car dealership. He returned on several occasions because the car had many little problems that needed fixing. He asked if he could exchange his Cobra for the teal Camaro. Rivera and Santos teased Gonzales about his car because it was not "as fast as a Z28." [Petitioner] argued that witnesses who referred to "Alex" meant Alex Gonzales, and he, not [petitioner], was responsible for the shooting.

3

1
2
3

> [Petitioner] was arrested in Mexico in July of 2005.  He was deported.  The facts surrounding the statements he made en route to California will be discussed below.  Suffice it to say, he was tried for murder and convicted following his jury trial.

4   (People v. Santana, LD 4 at 2-4.)

5   IV.  Standards for a Writ of Habeas Corpus

6              An application for a writ of habeas corpus by a person in custody under a

7   judgment of a state court can be granted only for violations of the Constitution or laws of the

8   United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the

9   interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991);

10  Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

11             Federal habeas corpus relief is not available for any claim decided on the merits in

12  state court proceedings unless the state court's adjudication of the claim:

13             (1) resulted in a decision that was contrary to, or involved an
14             unreasonable application of, clearly established Federal law, as
              determined by the Supreme Court of the United States; or

15             (2) resulted in a decision that was based on an unreasonable
              determination of the facts in light of the evidence presented in the
16             State court proceeding.

17  28 U.S.C. § 2254(d).

18             Under section 2254(d)(1), a state court decision is "contrary to" clearly

19  established United States Supreme Court precedents if it applies a rule that contradicts the

20  governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

21  indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different

22  result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-06

23  (2000)).

24             Under the "unreasonable application" clause of section 2254(d)(1), a federal

25  habeas court may grant the writ if the state court identifies the correct governing legal principle

26  from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

1  prisoner's case.  <u>Williams</u>, 529 U.S. at 413.  A federal habeas court "may not issue the writ

2  simply because that court concludes in its independent judgment that the relevant state-court

3  decision applied clearly established federal law erroneously or incorrectly.  Rather, that

4  application must also be unreasonable."  <u>Id.</u> at 412; <u>see</u> also <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75

5  (2003) (it is "not enough that a federal habeas court, in its independent review of the legal

6  question, is left with a 'firm conviction' that the state court was 'erroneous.'") (internal citations

7  omitted).  "A state court's determination that a claim lacks merit precludes federal habeas relief

8  so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."

9  <u>Harrington v. Richter</u>, 131 S. Ct. 770, 786 (2011).

10            The court looks to the last reasoned state court decision as the basis for the state

11  court judgment.  <u>Avila v. Galaza</u>, 297 F.3d 911, 918 (9th Cir. 2002).  If there is no reasoned

12  decision, "and the state court has denied relief, it may be presumed that the state court

13  adjudicated the claim on the merits in the absence of any indication or state-law procedural

14  principles to the contrary."  <u>Harrington</u>, 131 S. Ct. at 784-85.  That presumption may be

15  overcome by a showing that "there is reason to think some other explanation for the state court's

16  decision is more likely."  <u>Id.</u> at 785 (citing <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991)).

17  V.  <u>Petitioner's Claims</u>

18                A.  <u>Admission of Statements by Rivera to Morgan</u>

19            Petitioner claims that the trial court erred in allowing the introduction of

20  statements made by Rivera to Morgan because the statements were allegedly untrustworthy

21  because they were self-serving, blame-shifting, and made to preserve Morgan's approval of

22  Rivera.  Petitioner supports this claim as follows:

23            At multiple junctures, Morgan questioned Rivera as [to] how he
             could be involved in such a horrendous crime, and it is clear that
24            Rivera responded by minimizing his involvement and shifting
             responsibility to others so as to maintain his girlfriend's approval.
25            The statements in this case constitute precisely the sort of blame-
             shifting by the declarant to the charged defendant that are routinely
26            held to defeat trustworthiness.  Accomplice statements are

5

> generally viewed with distrust because of an accomplice's inherent
> motives to fabricate a self-serving account.  Trustworthy
> accomplice statements are the exception and not a rule or the rule.

(Dkt. No. 1 at 5.)  In his traverse, petitioner argues that cross-examination of Rivera could have

changed the jury's perception of Rivera's truthfulness.  (Dkt. No. 1 at 10.)  Rivera was

unavailable for cross-examination at trial because Rivera invoked the Fifth Amendment privilege

as to all questions.  (3 Reporter's Transcript ("RT") at 603-04.)  Respondent argues that the state

court's rejection of this claim was objectively reasonable.  (Dkt. No. 12 at 12.)

      The last reasoned rejection of this claim is the decision of the California Court of

Appeal for the Third Appellate District on petitioner's direct appeal.  The state court addressed

this claim as follows:

> [Petitioner] contends the admission of the incriminating statements
> Rivera made to his friend and casual lover, Amber Morgan, constitutes
> prejudicial error.  We begin by dismissing any notion that this alleged
> error, either individually or cumulatively with the other errors he asserts,
> would have been prejudicial.  As chronicled above, the evidence of guilt
> was not merely substantial, but overwhelming.  Seldom do we see such
> compelling evidence of motive, opportunity, identity, forensic evidence,
> and flight.  We could end our discussion there, since even if we sustained
> each of [petitioner's] allegations of error, he would not be entitled to a
> reversal.  However, we will address each of his three allegations of error,
> and conclude each lacks merit.

> [Petitioner] challenges the admissibility of Rivera's statements on
> two grounds:  (1) he contends the statements were testimonial and
> therefore inadmissible pursuant to Crawford v. Washington (2004)
> 541 U.S. 36 [158 L.Ed.2d 177] (Crawford) because a reasonable
> person would have anticipated that the recipient would have
> revealed them to law enforcement and they would have been used
> at trial, and (2) if they were not testimonial, they were
> untrustworthy because they were uttered by an accomplice who
> sought to minimize his own involvement.  We begin with an
> examination of the statement itself.

> Amber Morgan was an assistant manager at the apartment
> complex where Rivera resided.  After he moved into the complex
> in May of 2000, they became close friends and casual lovers.
> About 10:00 p.m. on August 22, 2000, Rivera called Morgan and
> asked if he could see her.  He drove to her apartment and confided
> in her that he had been involved in a murder.  He explained that he
> owed a friend a favor and agreed to drive him to a car dealership so
> the friend could steal a car for a new transmission.  Unbeknownst

6

to him, his friend had a gun, and he accidentally shot the car salesman who accompanied them on a test drive of the car he planned to steal, then pushed the salesman out of the car onto the side of the freeway.  Rivera was nervous; in fact, he was crying as he explained what had happened.  He lamented that "peer pressure is a bitch."  Morgan encouraged him to go to the police, but Rivera refused because he did not want to "snitch" on his friends.  He told her that if he was confronted he was going to "come out clean," but he was not going "to walk into the police department and . . . snitch out my friends."  Morgan told Rivera that if the police came looking for him, she was going to have to give them information about where he lived and a description of his car.  As Morgan and Rivera watched a news report on television (even though the sound did not work), Rivera got a call on his cell phone and she heard him say that he would meet the caller later.  Rivera told Morgan he was going home to sleep, but when she spoke to him later, he was awake and very nervous.

The trial court found that Rivera's statements were not testimonial and did not violate the confrontation clause protections enunciated in Crawford, supra, 541 U.S. 36.  Moreover, the court also found that the statements were clearly against Rivera's penal interests and were trustworthy.  The court explained, "While the fact that a person seeks to shift blame to another may indicate that the statement is not against interest, that is not so where the recitation appears to be a truthful account of the events, and the statements made, taken together, are so clearly against one's interest a person would not make such a statement unless they believed it true."

The trial court asked the right questions in the right order.  "Because Crawford applies only to 'testimonial statements,' we must first determine whether [the declarant's] statement falls into that category.  If the statements are testimonial, the only acceptable indicia of reliability is confrontation.  If the statements were nontestimonial, then we may consider whether they can be admitted consistent with the hearsay rules of evidence."  (People v. Cervantes (2004) 118 Cal.App.4th 162, 173 (Cervantes).)  Indeed, because Cervantes is factually analogous to the case before us, it provides an analytical template and an apt application of the law to remarkably similar facts.

In Cervantes, as here, an accomplice told a neighbor what had occurred during the commission of the charged offenses.  In both cases, the statements were made within hours of the crime, and although the declarants incriminated themselves, they ascribed greater responsibility to the perpetrators and reserved for themselves comparatively minor roles.

The court in Cervantes rejected the notion that statements made to a neighbor under these circumstances fell within the meaning of

"testimonial."  It is true the United States Supreme Court left open the meaning of testimonial, only offering a few exemplars of statements it considered testimonial.  Applying <u>Crawford</u>, the <u>Cervantes</u> court wrote, "Initially, it appears clear that [the declarant's] statement is not similar to the primary examples of testimonial statements given in <u>Crawford</u>, namely, grand jury testimony, prior trial testimony, ex parte testimony at a preliminary hearing, or statements taken by police officers in the course of interrogations."  (<u>Cervantes</u>, <u>supra</u>, 118 Cal.App.4th at p. 173.)  The accomplices in <u>Cervantes</u> argued, as [petitioner] does here, that testimonial statements include those made under circumstances that an objective witness would reasonably believe would be available for use at trial.  (<u>Id</u>. at pp. 173-174.)  The court in <u>Cervantes</u> made no attempt to evaluate the contours or nuances of such an expansive definition of "testimonial" because it concluded the declarant made the statement without any reasonable expectation it would be used at a later trial.

    In <u>People v. Taulton</u> (2005) 129 Cal.App.4th 1218, however, the court concluded that the test for determining whether a statement is "testimonial" under <u>Crawford</u> is not whether its use in a potential trial is foreseeable, but whether it was obtained for the purpose of potentially using it in a criminal trial or determining if a criminal charge should be filed.  (<u>Taulton</u>, at pp. 1223-1224.)  Although the logic of <u>Taulton</u> is sound, we will follow the <u>Cervantes</u> lead to give [petitioner] the benefit of every possible argument he may have.  Clearly, Rivera's statements would not be testimonial under <u>Taulton</u> as they were not obtained for the purpose of using them in a criminal trial.

    Morgan had no connection to law enforcement.  She was not an agent of the police, but a friend and confidant of Rivera.  He went to her seeking comfort and solace within hours of the murder while he was still shaking and nervous.  [Petitioner], like the accomplices in <u>Cervantes</u>, argued the statements were testimonial because Rivera made the statements to his friend "knowing she would repeat [them] to the police, as she eventually did." (<u>Cervantes</u>, <u>supra</u>, 118 Cal.App.4th at p. 174.)  But the possibility that a friend may eventually be compelled to testify does not transmute every confidential communication into testimony.  Thus, we too conclude it was not objectively reasonable for Rivera to believe the statements he made against his penal interest to his friend and casual lover would be available for use at trial.  In short, his confession was not testimonial within the meaning of the right to confrontation.

    The more difficult question is whether his nontestimonial statements bear sufficient indicia of trustworthiness so as to render them admissible against [petitioner].  "There is no litmus test for the determination of whether a statement is trustworthy and falls within the declaration against interest exception.  The trial court

must look to the totality of the circumstances in which the statement was made, whether the declarant spoke from personal knowledge, the possible motivation of the declarant, what was actually said by the declarant and anything else relevant to the inquiry." (People v. Greenberger (1997) 58 Cal.App.4th 298, 334 (Greenberger).)  While the court in Greenberger assumes that the scope of appellate review is limited to a finding of an abuse of discretion, the court in Cervantes concluded it was appropriate to conduct de novo review of the totality of the circumstances surrounding the making of the statement.  (Cervantes, supra, 118 Cal.App.4th at pp. 174-175.)  Again in deference to [petitioner], we will apply a de novo standard of review without deciding whether in other cases the more onerous standard would be demanded.

[Petitioner] argues Rivera's statements inherently are not trustworthy because he sought to minimize his own culpability by shifting blame to [petitioner] and the others.  Greenberger acknowledged the particular dangers involved when one accomplice turns on another:  "Clearly the least reliable circumstance is one in which the declarant has been arrested and attempts to improve his situation with the police by deflecting criminal responsibility onto others.  'Once partners in crime recognize that the "jig is up," they tend to lose any identity of interest and immediately become antagonists, rather than accomplices.'  [Citation.]  However, the most reliable circumstance is one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures. [Citations.]"  (Greenberger, supra, 58 Cal.App.4th at p. 335.)

The court in Cervantes, however, navigated the same treacherous terrain with an evaluation equally applicable to the similar facts presented here.  The court wrote: "The evidence here showed [the declarant] made the statement within 24 hours of the shooting to a lifelong friend from whom he sought medical treatment for injuries sustained in the commission of the offenses.  Further, it is likely [the declarant] wanted to have his wounds treated without going to the hospital.  Regarding the content of the statement, [the declarant] did attribute blame to Cervantes and Martinez but accepted for himself an active role in the crimes and described how he had directed the activities of Martinez.  Thus, [the declarant's] statement specifically was disserving of his penal interest because it subjected him to the risk of criminal liability to such an extent that a reasonable person in his position would not have made the statement unless he believed it to be true."  (Cervantes, supra, 118 Cal.App.4th at p. 175.)

So too did Rivera subject himself to the risk of criminal liability by confessing to Morgan that he helped [petitioner], knowing [petitioner] planned to steal the car during a test drive. While he, like the declarant in Cervantes, ascribed primary responsibility to

1    others for the eventual shooting, he accepted for himself an active
     role in the crime, admitting his involvement in the planned
2    carjacking as well as in helping to wipe down the stolen car after
     the carjacking and murder.  As a consequence, his statements
3    subjected him to prosecution.  It is unlikely he would have indicted
     himself to his friend and lover in a manner clearly at odds with his
4    penal interests if his statements had not been true.

5        [Petitioner] adds rampant speculation to his argument.  He asserts
     Rivera was attempting to avoid the felony murder rule and curry
6    his girlfriend's favor to maintain the relationship, and concealed
     [petitioner's] name to give only a partial accounting of what had
7    occurred.  There, of course, is no evidence Rivera has the
     sophistication to know the felony murder rule or its implications,
8    he need not have told Morgan anything about the events of the
     shooting if he wanted to curry favor with her, and he could have
9    withheld [petitioner's] name for the very reason he told Morgan he
     would not go to the police -- he was loyal to his friends and did not
10   want to "snitch" on them.

11       Like the court in Cervantes, we conclude that Rivera's statements
     to Morgan are inherently trustworthy as a declaration against his
12   penal interest made in the privacy of his girlfriend's apartment
     within a few hours of the events he described.  Moreover, he was
13   tearful, nervous, and scared, and divulged his secrets before he had
     any inkling of an impending arrest.  Rather, he went to her for
14   comfort and support, and implicated himself in the murder of the
     car salesman.  Under the totality of circumstances presented here,
15   there are sufficient particularized guarantees of trustworthiness to
     assure us Rivera's statements were reliable and the rigors of
16   cross-examination were unnecessary.

17   (People v. Santana, LD 4 at 4-12.)

18       The Sixth Amendment to the United States Constitution grants a criminal

19   defendant the right "to be confronted with the witnesses against him."  U.S. Const. amend. VI.

20   In 2004, the United States Supreme Court held that the Confrontation Clause bars the state from

21   introducing into evidence out-of-court statements which are testimonial in nature unless the

22   witness is unavailable and the defendant had a prior opportunity to cross-examine the witness,

23   regardless of whether such statements are deemed reliable.  Crawford v. Washington, 541 U.S.

24   36 (2004).

25       Confrontation Clause violations are subject to harmless error analysis.  Whelchel

26   v. Washington, 232 F.3d 1197, 1205-06 (9th Cir. 2000).  "In the context of habeas petitions, the

                                          10

1    standard of review is whether a given error 'had substantial and injurious effect or influence in

2    determining the jury's verdict.'" <u>Christian v. Rhode</u>, 41 F.3d 461, 468 (9th Cir. 1994) (quoting

3    <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993)).  Factors to be considered when assessing the

4    harmlessness of a Confrontation Clause violation include the importance of the testimony,

5    whether the testimony was cumulative, the presence or absence of evidence corroborating or

6    contradicting the testimony, the extent of cross-examination permitted, and the overall strength

7    of the prosecution's case.  <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 684 (1986).[2]

8           The state court's evaluation of the facts was objectively reasonable.  The trial

9    court properly found that Rivera's statements were not testimonial.  (6 Clerk's Transcript ("CT")

10    at 1770.)  Rivera's statements were statements made to his friend, who had no connection to law

11    enforcement, only hours after the criminal activity at issue.  The statements were not obtained in

12    an effort to arrest Rivera or to obtain incriminating statements from Rivera for use at a criminal

13    trial.  It is unlikely Rivera believed these statements would be admitted at trial.  Because Rivera's

14    statements were not testimonial, the Confrontation Clause is not implicated.

15           However, even if the Confrontation Clause applied to non-testimonial statements,

16    these statements fell within a recognized exception to the hearsay rule.  Rivera's statements to

17    Morgan were clearly made against Rivera's penal interests and were trustworthy.  <u>Lilly v.</u>

18    <u>Virginia</u>, 527 U.S. 116, 124-25 (1999) (hearsay dependable when the evidence falls within

19    hearsay exception or contains "particularized guarantees of trustworthiness.")  While Rivera

20    attempted to shift blame for the crimes to others, Rivera's statements implicated himself in the

21    plans to steal the car, and in his efforts to wipe down the car after the murder, and those

22    statements subjected Rivera to criminal liability.  Rivera's demeanor and statements to Morgan

23    reflect petitioner went to Morgan for comfort and support, and was unaware of an impending

24

---

25        [2]  Although <u>Van Arsdall</u> involved a direct appeal and not a habeas action, "there is
nothing in the opinion or logic of <u>Van Arsdall</u> that limits the use of these factors to direct
26   review."  <u>Whelchel</u>, 232 F.3d at 1206.

1    arrest.  This court finds that the state court's evaluation of Rivera's statements to Morgan was not

2    contrary to or an unreasonable application of Supreme Court authority.

3              But even assuming, arguendo, that Rivera's statements to Morgan were

4    testimonial, this court concludes that any error in admitting these statements was harmless.  As

5    noted by the Court of Appeal, the evidence against petitioner was staggering.  Petitioner wanted a

6    transmission for his Camaro, which established motive.  Petitioner was identified as the

7    perpetrator by Santos, who was present during the murder, and who testified at petitioner's trial.

8    (5 RT at 1210-1311.)  A videotape of Santos' statement to Detective Kingsbury was played for

9    the jury—Santos related the chronology of events surrounding the crimes and identified

10   petitioner as the "Alex" who needed the transmission, who planned to scare the car salesman out

11   of the car but shot him instead, and who then discarded his shirt in the river.  (8 CT at 2330.6.)

12   Also, forensic evidence connected petitioner to the crime.  DNA testing determined that material

13   found on the jeans recovered from the dumpster was a genetic match for petitioner and for the

14   victim.  Finally, petitioner subsequently fled to Mexico where he evaded authorities for five

15   years.  Petitioner's flight indicated consciousness of guilt.  Given this overwhelming evidence of

16   guilt, any error in admitting Rivera's statements to Morgan was harmless error.  Accordingly,

17   petitioner's first claim should be denied.

18              B.  Admission of Testimony Concerning Petitioner's Statement

19              In ground two, petitioner claims:

20              The trial court erred in allowing testimony concerning a statement
             made by [petitioner] prior to receiving Miranda warnings under an
21           exception for "booking questions" that should not have applied.

22              They directed the conversation to a hypothetical discussion of how
             a person might hide in Mexico City to avoid capture by American
23           authorities.  [Petitioner] was surely "in custody" as he was being
             taken involuntarily from Houston to Sacramento with his hands
24           secured; ultimately, the trial court excluded most of this evidence.

25   (Dkt. No. 1 at 7.)

26   ////

12

The last reasoned rejection of this claim is the decision of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal.  The state court addressed this claim as follows:

> Finally, [petitioner] contends the trial court committed reversible error by allowing a police detective to testify that [petitioner] falsely identified himself.  He insists the information the detective elicited prior to giving him the required Miranda [FN2] warnings did not fall within the "booking exception" because the questions were for an investigative, not an administrative, purpose.  We turn first to the record.

> FN2. Miranda v. Arizona (1966) 384 U.S. 436 [16 L.Ed.2d 694] (Miranda).

> Suspicious that he had fled to Mexico, Detective John Keller tried to locate [petitioner] for five years.  The FBI was also involved in the search and ultimately located [petitioner] working in a hair salon in Mexico City.  The FBI informed Keller that [petitioner] would be deported and Keller, together with a Sacramento FBI agent, could pick him up in Houston and transport him to Sacramento.  Although [petitioner] was using the name Roberto Benitez, he was positively identified as Alejandro Santana by the Mexican immigration authorities and this information was conveyed to Keller.  One of the immigration officials showed an FBI agent a Mexican voter registration card with [petitioner's] picture and the name Roberto Benitez Arizmendi.

> Keller met [petitioner] at the Houston airport.  He was unsure if [petitioner] was, in fact, Alejandro Santana because he appeared to have lost a lot of weight.  The FBI agent assured Keller the man in custody was Santana, but Keller was not convinced.  [Petitioner] was restrained.  He was not given his Miranda advisements.

> A few minutes into the flight from Houston to Sacramento, Keller said to [petitioner], "[H]ey, I know you're Alejandro Santana."  [Petitioner] replied, "[N]o, I'm Roberto Benitez." During the course of the flight, [petitioner] continued to deny that he was Alejandro Santana.  Either the FBI agent or Keller asked [petitioner], hypothetically, what a guy would do to avoid being arrested if he were on the run.  [Petitioner] stated someone might "cut all ties with family, . . . start a new life, don't look back, don't go back."

> Before reading [petitioner] his Miranda rights at the police headquarters in Sacramento, Keller again asked [petitioner] his name and [petitioner] again replied, "Roberto Benitez."  Keller confronted him, explaining there was no need to continue the ruse. But [petitioner] denied he was Santana.  Once he was read his

rights, [petitioner] invoked his right to remain silent.  He was fingerprinted again and the live scan result confirmed the fingerprints belonged to Alejandro Santana.

[Petitioner] moved to exclude all his statements to the police officers during transit, including his false identification.  The trial court granted the motion to exclude all the statements made during the transportation except the initial biographical questions.  The court explained, in pertinent part:  "In this case, the [petitioner] was unquestionably in custody.  The issue is whether the questions posed to him constituted interrogation.  [¶] . . . [¶]  Routine booking questions do not constitute a violation of Miranda as the Supreme Court has recognized an exception for questions that are posed during the booking process, such as biographical information that is not of an investigative nature, but rather is the identifying data required for booking and arraignment.  Ordinarily, the routine gathering of background biographical data will not constitute interrogation.  US ex rel. Hines v. La Valle (521 F. 2d 1109 ) PA v. Munis [sic-Muniz] 496 U.S. 583 [sic-582] [1975].  The Supreme Court['s] concern is protecting the suspect against interrogation of an investigative nature rather than the obtaining of basic identifying data required for booking and arraignment.  Using that rationale, the initial question to Santana about his name, is not a question that the officers should have known would be reasonably likely to elicit an incriminating response.  Therefore, the initial question posed to him does not constitute interrogation, and his response is admissible.  [¶]  However, once the [petitioner] responded, additional questions, including persistent questions about his identity, and the posing of 'hypothetical' questions are interrogation, and outside Miranda."

"'The Miranda safeguards are not necessary at a proper booking interview at which certain basic information is elicited having nothing to do with the circumstances surrounding any offense with which the defendant has been charged.  [Citations.]  The booking procedure, as defined by statute (Pen. Code, § 7, subd. 21), has been described as "essentially a clerical process."  [Citation.]  The limited information needed at a booking procedure is required solely for the purposes of internal jail administration, not for use in connection with any criminal proceeding against the arrestee.  When use of this information is confined to those proper purposes, its elicitation cannot be considered incriminatory.'  [Citation.]  Consequently, the rights enumerated in Miranda, specifically the right to remain silent and the right to counsel, are not implicated by questions relating only to booking information.  Identification of the arrestee is a necessary and legitimate part of the booking process [citation]."  (People v. Powell (1986) 178 Cal.App.3d 36, 39-40.)

[Petitioner] argues the questions were not part of a clerical booking procedure but were designed to elicit incriminating

14

admissions.  He points out that Detective Keller asked him to identify himself when they were in Houston, long before the initiation of any formal booking in Sacramento.  Thus, he insists the questions did not fall within the "'booking question' exception" to the Miranda rule of inadmissibility.  (Pennsylvania v. Muniz (1990) 496 U.S. 582, 601 [110 L.Ed.2d 528].)

Although we conclude [petitioner] propounds an unnecessarily restrictive scope to the booking exception, we need not determine the outer boundaries of the exception here.  The trial court excluded all the damning statements [petitioner] made during the long flight to Sacramento except the initial question to obtain biographical information.  Those statements were excluded because, as the court clearly stated, "the [petitioner] was unquestionably in custody" and interrogation in the absence of Miranda advisements is prohibited.  Thus, the issue whether the initial question about [petitioner's] name and his responsive lie should have been excluded, either because it did not constitute interrogation since it was not designed to obtain an incriminating response or because it fell within the booking exception, is but a footnote in this trial, and it is inconsequential whether the response was admitted or not.

There was uncontroverted evidence that [petitioner] hid his identity for five years.  He lived under an assumed name in Mexico.  His Mexican voter registration card represented that he was Roberto Benitez.  As a result, the testimony that he also told Detective Keller that his name was Roberto Benitez Arizmendi and denied he was Alejandro Santana was cumulative to the abundant evidence of consciousness of guilt the jury had already heard.  On this record, the error, if any, in allowing Keller to testify that [petitioner] gave a false identity is harmless beyond a reasonable doubt and does not constitute reversible error under any standard.  [FN3]

> FN3. The recent amendments to Penal Code section 4019 do not operate to modify [petitioner's] entitlement to credit, as he was committed for serious and violent felonies.  (§ 4019, subds.(b) & (c); Stats. 2009, 3d  Ex. Sess., ch. 28, § 50.)

(People v. Santana, LD 4 at 15-19.)

A suspect who is subject to custodial interrogation has the right to remain silent.

See Miranda, 384 U.S. at 444, 479; see also Dickerson v. United States, 530 U.S. 428, 442

(2000) (Miranda's protections are constitutionally based and cannot be altered by statute).  An

officer's obligation to give a suspect Miranda warnings before interrogation arises only when the

1   individual is "in custody," <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977) (per curiam), and

2   applies if the person is subjected to "either express questioning or its functional equivalent,"

3   <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300-01 (1980).  Put another way, "interrogation" for

4   purposes of <u>Miranda</u> refers not only to express questioning, but also to any words or actions on

5   the part of the police officers that "they *should have known* were reasonably likely to elicit an

6   incriminating response."  <u>See id.</u> at 301 (italics in original); <u>Pennsylvania v. Muniz</u>, 496 U.S.

7   582, 600-01 (1990) (plurality opinion).  However, questions of law enforcement falling within

8   the "routine booking question exception" are exempted from <u>Miranda's</u> coverage.  Routine

9   booking questions are defined as those questions necessary to secure the "biographical data

10  necessary to complete booking or pretrial services."  <u>See Muniz</u>, 496 U.S. at 601.

11          However, an error by a state trial court in admitting into evidence statements

12  taken in violation of <u>Miranda</u> is subject to a harmless error analysis.  <u>Arnold v. Runnels</u>, 421

13  F.3d 859, 867 (9th Cir. 2005); <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1271 n.9 (9th Cir. 2005).  Under

14  that analysis, a writ of habeas corpus will issue only if the error "had substantial and injurious

15  effect or influence in determining the verdict."  <u>Brecht</u>, 507 U.S. at 637 (quoting <u>Kotteakos v.</u>

16  <u>United States</u>, 328 U.S. 750, 776 (1946)).  In addition, in order to grant habeas relief where a

17  state court has determined that a constitutional error was harmless, a reviewing court must

18  determine:  (1) that the state court's decision was "contrary to" or an "unreasonable application"

19  of Supreme Court harmless error precedent, and (2) that the petitioner suffered prejudice under

20  <u>Brecht</u> from the constitutional error.  <u>Inthavong v. LaMarque</u>, 420 F.3d 1055, 1059 (9th Cir.

21  2005).  Both of these tests must be satisfied before relief can be granted.  <u>Id.</u> at 1061.

22          The trial court barred the admission of all of petitioner's statements made during

23  transit from Houston to Sacramento except for petitioner's response to the first question:

24  petitioner "was asked his name and responded 'Roberto Benitiz [sic].'"  (6 CT at 1757-59.)

25          Detective Keller flew to Houston on July 6, 2005, to take custody of petitioner.

26  Questioning of petitioner began around 8:35 p.m. on July 6, 2005.  (4 CT at 1099.)  Homicide

1  detective John Keller testified that in Houston petitioner identified himself as "Roberto Benitez."

2  (6 RT at 1794.)  Petitioner was booked into Sacramento County Jail at 1:10 a.m. on July 7, 2005.

3  (4 CT at 1098.)  Keller also testified that during booking in Sacramento, petitioner again

4  provided the name "Roberto Benitez" when asked.  (6 RT at 1795.)  No other statements made

5  by petitioner during transit from Houston to Sacramento were admitted at trial.

6          The state court's ruling on petitioner's <u>Miranda</u> claim was objectively reasonable.

7  The trial court refused to allow any of petitioner's statements, except for the response to the

8  identification question, to be admitted at trial.  The trial court properly found that the first

9  question was biographical under the booking question exception, because it asked for petitioner's

10  name, and was not interrogation.  (6 CT at 1758.)  Moreover, as noted by the state court,

11  petitioner's response to the identification question was cumulative in the face of testimony that

12  petitioner responded "Robert Benitez" when booked into Sacramento County Jail, and in light of

13  FBI Special Agent Douglas Davis' testimony that the name "Roberto Benitez Arizmendi"

14  appeared on the Mexico Voter's Registration card found in petitioner's possession by Mexico

15  immigration officials.  (6 RT at 1777.)

16          But even if admission of petitioner's first response was error, it was harmless.

17  Any error in the admission of this one response could not have had a substantial or injurious

18  effect or influence on the jury's verdict because of the overwhelming evidence of petitioner's

19  guilt, as set forth above.  The state court's rejection of petitioner's second claim for relief was

20  neither contrary to, nor an unreasonable application of, controlling principles of United States

21  Supreme Court precedent.  Therefore, petitioner's second claim for relief should be denied.

22  VI.  Conclusion

23          Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for

24  a writ of habeas corpus be denied.

25          These findings and recommendations are submitted to the United States District

26  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

1  one days after being served with these findings and recommendations, any party may file written

2  objections with the court and serve a copy on all parties.  Such a document should be captioned

3  "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files

4  objections, he shall also address whether a certificate of appealability should issue and, if so, why

5  and as to which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if

6  the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C.

7  § 2253(c)(3).  Any response to the objections shall be filed and served within fourteen days after

8  service of the objections.  The parties are advised that failure to file objections within the

9  specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951

10  F.2d 1153 (9th Cir. 1991).

11  DATED:  August 11, 2011

12

13

14  KENDALL J. NEWMAN
    UNITED STATES MAGISTRATE JUDGE

15  sant2317.157

16

17

18

19

20

21

22

23

24

25

26